IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

**FILED**

**AUG 3 1 2000**

UNITED STATES DISTRICT ⌐ ·R·
NORTHERN DISTRICT OF A.·. ··.

| | | |
|---|---|---|
| **TAMKO ROOFING PRODUCTS, INC.,** | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action Number |
| | ) | |
| vs.. | ) | **98-C-2534-W** |
| | ) | |
| **UNITED STEELWORKERS OF AMERICA, LOCAL 10711** | ) | |
| | ) | |
| Defendant. | ) | |

**ENTERED**

SEP  1 2000

## MEMORANDUM OPINION GRANTING THE PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

In this case, the parties have filed cross-motions for summary judgment.

Plaintiff TAMKO Roofing Products, Inc. ("TAMKO") seeks to vacate an arbitrator's award;

Defendant United Steelworkers of America, Local 1071L ("the Union") seeks to enforce it.

Solely based on public policy considerations, the Court concludes that it should not be

enforced.

### I. The Undisputed Facts[1]

1. TAMCO is a manufacturer and distributor of commercial and residential

---

[1] Mindful that "[t]he parties did not bargain for the facts to be found by a court, but by an arbitrator chosen by them" the court relies principally on the factual findings of the arbitrator, hereinafter referred to as the Arbitrator's Award ("AA"). *United Paperworkers Int'l Union v. Misco*, 484 U.S. 29, 108 S.Ct. 364 (1987)("*Misco*").

roofing products.  The Company owns and operates several manufacturing plants, including

a plant in Tuscaloosa, Alabama.  The Tuscaloosa plant employs approximately 180 hourly-

paid production, maintenance, shipping and receiving employees represented by United

Steelworkers of America, Local 1071L.  About 25% of the work force employed at the

Tuscaloosa plant is African-American.

      2.  Bobby Campbell, a white employee of TAMCO, was a lead man in the

TAMCO's Tuscaloosa plant's Shipping Department.  Campbell was discharged by the

Company on October 30, 1997, for violating the Company's business conduct policy, which

incorporates a prevention of workplace harassment.  Campbell was a long service employee

of the Company at the Tuscaloosa plant, having been first employed in 1979.

      3.  On October 27, 1997, at approximately 6:00 A.M., Nathaniel Williams, an

African-American employed by Cummings Truck Line as a truck spotter, was standing

outside the Tuscaloosa plant's shipping office located in the vicinity of the plant's shipping

dock.

      4.  Williams was assigned by his employer Cummings on a full-time daily basis

to spot Cummings trailers at the TAMCO's Tuscaloosa plant's shipping dock.  Williams had

held this job assignment for about three years.

      5.  As a truck spotter, one of Williams' functions is to communicate to

TAMCO Shipping Department personnel the trailer numbers of the Cummings trailers which

Williams has spotted in TAMKO's truck bays and the order numbers for each of the

2

Cummings trailers which Williams has spotted.  Williams communicates such information periodically during the course of each work day to a TAMKO shipping lead man stationed in the shipping office.

6.  On October 27, two Shipping Department lead men were employed at the Tuscaloosa plant, Campbell and Andy Miles, another white employee.  At 6:00 A.M. on that day, both Campbell and Miles were seated inside the shipping office.  Campbell was seated next to a sliding glass window which is opened by the lead man whenever a truck spotter, truck driver, or other person needs to communicate with the lead man inside the office.  Campbell's desk is at a right angle to the sliding glass window and the desk occupied by miles faces directly toward the sliding glass window.  At 6:00 A.M. Williams was standing outside the shipping office waiting for Campbell to open the window so that Williams could communicate to Campbell the trailer numbers of the trailers he had spotted that morning and the order numbers for each trailer.

7.  Campbell did not notice Williams standing outside waiting for Campbell to open the window.  After Williams had been waiting several minutes, Miles, who could see Williams through the office window, said to Campbell, "Nate's standing at the window."  Campbell then opened the window and, according to his testimony, said to Williams: "Hey, man, I'm sorry, I didn't see you.  There's not enough light.  Maybe you need to paint your face white."  Williams maintains that Campbell said, "You ought to paint your face white so I can see you better."  Miles, the only other person who was present when Campbell opened

3

the window and spoke to Williams, testified that Campbell's statement to Williams was: "Man, you need to put some white shoe polish or something on your face. I didn't see you standing there."

8. Williams contends that Campbell's statement to him hurt him and caused him to be both distraught and angry. Williams was still "angry" when he talked to Miles a short time later. Miles told Williams that he had overheard Campbell's statement to Williams and suggested to Williams that he report the occurrence to a Shipping Department Supervisor, Ron Mitchell. Williams did so the same morning. Mitchell then interviewed both Williams and Campbell some time around 10:00 A.M. on that day and reported the occurrence to the Shipping Department Manager, Mike White, and to the Tuscaloosa plant General Manager, Tom Deloughery.

9. General Manager Deloughery, after receiving the report from White and Mitchell, conducted an investigation of the matter. Deloughery first interviewed Williams, and concluded that Campbell's statement to Williams had "embarrassed [Williams] and had made him feel bad and it hurt him."

10. Following his interview of Williams, Deloughery interviewed Campbell. Campbell admitted: "No, I told him he should put white shoe polish on his face so I could see him better, but I didn't mean anything by it, I was only kidding."

11. Based upon his investigation of the occurrence, Deloughery determined that Campbell had made one of two statements to Williams on the morning of October 27.

4

Campbell had either said to Williams, "You should paint your face white" or "You should put white shoe polish on your face." Deloughery concluded that, whichever of the two statements Campbell had made to Williams, the statement was racially demeaning and offensive.

12.   Less than two weeks before October 27, Campbell had attended a sensitivity training workshop conducted by TAMKO, focusing on racial and sexual harassment in the workplace. The workshop, which was conducted on a department-by-department basis, was attended by all employees at the Tuscaloosa plant, including Bargaining Unit employees, non-unit employees, supervisors and managers. The Company conducted the workshop because of allegations of a racially hostile work environment at the Tuscaloosa plant which was asserted in a race discrimination lawsuit brought against the company by a former African-American employee. In September 1997, the Company's legal counsel had investigated the allegations and, as a result of that investigation, recommended that sensitivity training be conducted at the Tuscaloosa plant regarding racial and sexual harassment.

13. Campbell, along with other Shipping Department employees, attended the sensitivity training workshop held on October 15, 1997. Miles also attended the workshop. The workshop was conducted by the plant's Human Resources Manager, Dwight Wood. Wood, among other things, told the workshop attendees, including Campbell, that racial jokes and racial comments at the plant would not be tolerated by the Company, and that

TAMKO had "zero tolerance" for such conduct. Wood also told the workshop attendees, including Campbell, that "Tamko would not tolerate any type of racial comments or racial slurs and that any violation of this policy would be dealt with severely up to and including termination."

15. On October 29, Dougherty advised Campbell that he was suspended pending further investigation. Dougherty advised Campbell and the Union's Shop Steward that Campbell would likely be discharged.

16. The decision to discharge Campbell was made by Deloughery after consultation with the Company's Vice President of Manufacturing, Tom King, and the company's in-house attorney, Bob Bradley. Recognizing that Campbell was a long service employee and that he had no prior disciplinary record, Deloughery, King and Bradley discussed and considered the possibility of imposing a lesser penalty than discharge for Campbell's conduct on October 27. All three concurred, however, that Campbell should be discharged. Deloughery explained the basis of the decision:

> "Several reasons, the first and foremost is the seriousness of the offense. We have a situation where Mr. Campbell directly confronted a black person and humiliated him based on his race, and in talking with Nate (Williams) I could see that he was hurt, he was upset, he wanted to know – he asked me what I have done to cause this. As far as I could see, he hadn't done anything to cause it. And he didn't understand why people would humiliate him like that and treat him like that, that is, why Bobby treated him like that. I felt it was a very serious offense. It had resulted in serious harm to a human being.

6

Second reason is we had just finished the training. I mean training wasn't two weeks old and already we had a situation where somebody had disregarded the training that we had offered. And in the training we had told the people, we had put them on notice, this is not going to be tolerated. If you do it, you're going to be severely disciplined, and within two weeks it happened. And the third reason is I felt that if I didn't take strong actions that I would be undermining the policy that Tamko has, the fact that if I didn't do something very strong that I would be condoning that type of activity in the plant."

17.   Deloughery notified Campbell on October 30, 1997, that he was discharged from the Company's employment. The Union grieved the discharge pursuant to the Grievance-Arbitration procedures of the Union Agreement. The grievance was denied by the Company and the Union.

18.   The collective bargaining agreement between TAMKO and the Union provides, in relevant part:

"Art. V, Sec. 5.   Limitations on Power of the Arbitrator; Discharge and Disciplinary Cases.  In discharge or discipline cases, the arbitrator's authority and function shall be limited to answering the following questions: (1) whether the conduct or actions of the grievant which led to the discharge or discipline did, in fact, occur and, if so (2) whether such conduct or actions by the grievant justified disciplinary action by the Company.  If the arbitrator answers both of the foregoing questions in the affirmative, he shall deny the grievance and sustain the discharge or other discipline imposed by the Company.  The arbitrator shall have no authority in discharge or disciplinary cases to substitute his judgment for that of the Company in respect to the appropriate degree of discipline."

7

19. Following the arbitration hearing, the Arbitrator sustained Campbell's grievance and ordered him reinstated, with backpay.

20. The Arbitrator found that Campbell had not violated TAMKO's Workplace Harassment Policy, which provides in relevant part:

> "No employee of TAMKO should harass others, be they co-workers, subordinates or supervisors. Harassment can interfere with any employee's work, make the working environment offensive and destroy teamwork. It is TAMKO's policy that no form of harassment should be present in the workplace."

In reaching his conclusion, the Arbitrator reasoned that

> If the Company had wished to prohibit harassment not only of co-workers, subordinators or supervisors, it should have provided that its Prevention of Harassment Policy would also apply to other individuals as employees of the Company's customers or as individuals who were on the Company's premises with the Company's permission.
> ...It would not be equitable in this Arbitrator's opinion to stretch the wording which is the Company's wording in its Prevention of Harassment Policy to cover the harassment of people not co-workers, subordinates, or supervisors.

Arbitrator's Award, pp. 14-15. The basis of the Arbitrator's award was that the Company had charged Campbell with "an offense which could only arise in harassment of a co-worker of [Campbell]." *Id*. at p. 16.

## II.  Applicable Legal Standards

Since the *Steelworkers Trilogy, United Steelworkers of America v. American Mfg. Co.,*, 363 U.S. 564, 567, 80 S.Ct. 1343 (1960); *United Steelworkers of America v.*

*Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct 1347; *United Steelworkers of America v. Enterprise Wheel & Car Co.*, 363 U.S. 593 (1960), the primacy of arbitration awards in the context of labor disputes has been settled:

> [t]he question of the interpretation of the collective bargaining agreement is a question for the arbitrator. It is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his.

*United Steelworkers of Am. v. Enterprise Wheel & Car. Corp.,* 363 U.S. 593, 599, 80 S. Ct. 1358, 1362 (1960).  Unless the award is merely the arbitrator's "own brand of industrial justice"  or does not "dra[w] its essence from the collective bargaining agreement," a court is generally bound to enforce the award; it may not second-guess the decision. *Id.,* at 597, 80 S.Ct. at 1361. It is irrelevant that the basis of the decision is ambiguous,  that the arbitrator misread the contract, that the decision may appear to be incorrect, or that the decision is wrong. The courts generally "have no business weighing the merits"of the arbitration award. *Steelworkers v. American Mfg.,* 363 U.S. at 567-68, 80 S.Ct. at 1346.

Eleventh Circuit jurisprudence requires that the party seeking to vacate an arbitration "refute every reasonable basis upon which the arbitrator may have acted." Osram Sylvania, Inc. v. Teamsters Local Union, 87 F.3d 1261, 1264 (11th Cir. 1996).

There is a narrow exception to the general judicial enforcibility of arbitration awards: an arbitration award that contravenes public policy is unenforceable.  *W.R. Grace & Co. v. Local Union 759, International Union of United Rubber,* 461 U.S. 757, 103 S.Ct.

2177 (1983); *Professional Administrators Ltd. v. Kopper-Glo Fuel, Inc.*, 819 F.2d 639, 643

(6th Cir. 1987). The Supreme Court has described the public policy doctrine as follows:

> A court's refusal to enforce an arbitrator's award under a
> collective-bargaining agreement because it is contrary to public
> policy is a specific application of the more general doctrine,
> rooted in the common law, that a court may refuse to enforce
> contracts that violate law or public policy. . . That doctrine
> derives from the basic notion that no court will lend its aid to
> one who founds a cause of action upon an immoral or illegal act,
> and is further justified by the observation that the public's
> interest in confining the scope of private agreements to which it
> is not a party will go unrepresented unless the judiciary takes
> account of those interests when it considers whether to enforce
> such agreement.

*Misco,* 484 U.S. at 42.[2] (citations omitted).

The issue of whether an award violates "public policy" is to be determined

judicially. *Id.*, at 43 (citing *W.R. Grace*, 461 U.S. at 766, 103 S.Ct. at 2183; *Professional*

*Administrators*, 819 F.2d at 644. But, a court may refuse to enforce and arbitral award only

in limited situations where the award would violate some explicit, well-defined and dominant

public policy. Public policy may not be discerned from "general consideration of supposed

public interests," but rather by reference to specific laws and legal precedents. *Misco,* 484

U.S. at 43, 80 S. Ct. at 373, *citing W.R. Grace,* 461 U.S. at 766, 103 S. Ct. at 2183.

In the seminal case *Delta Air Lines Inc. v. Air Lines Pilots Assoc.*, Int'l., 861

---

[2] In *Misco*, the Supreme Court overturned the Fifth Circuit's declination to enforce an
arbitration award reinstating a discharged employee who had violated the company's drug
policy.

F.2d 665 (11th Cir. 1988), the Eleventh Circuit enunciated the standard for determining

whether the rare public policy exception will bar the judicial non-enforcement of an

arbitration award. That case involved an arbitration award which reinstated a pilot discharged

for having flown while drunk a passenger-filled Boeing-727 from Boston to Bangor, Maine.[3]

The district court had refused to enforce the award on public policy grounds. Reversing the

district court, the circuit held that the public policy exception may be invoked only in the rare

situation where the offending conduct arises from the performance of employment duties.

The availability of the exception turns on whether the wrongdoer "is the employee qua

employee." The court distinguished *Misco* and *Florida Power:*

> The employee in Misco appears to have smoked marijuana in a car in the
> plant's parking lot. The employee in Florida Power was discovered to have drug
> paraphernalia in his automobile. In these cases, the apparent wrongdoing was serious
> and is seriously condemned. However, in deciding to commit the wrong, the
> wrongdoer was not making an employment decision. The employer, on the other
> hand, may reasonably have disliked furnishing employment to one who is committing
> such wrongs. Yet, should the employer decide to continue to employ such a
> wrongdoer, even though his actions are condemned by public policy, that decision –
> to continue employment– is not itself contrary to public policy. Furthermore, the
> wrongdoing by an employee can be ended without affecting his employment. The
> wrongdoing and the employment are parallel but not intertwined. The wrongful
> conduct is wrongful, in and of itself, and its lawfulness vel non does not depend in

---

[3] A few months before the *Delta Airlines* case was decided, the circuit had dealt with a
similar issue - one in which an arbitrator's award reinstated an employee in whose car cocaine
and drug paraphernalia were found when he was arrested, off company time, for driving while
intoxicated. The employee was discharged for violating the company's drug policy, albeit that
the drug charges had been dismissed as part of a plea bargain. Relying on *Misco*, the circuit held
that "the district court exceeded its limited authority to review arbitration awards," and reversed
the district court's failure to enforce the award. *Florida Power Corp. v. International Broth. Of
Elec. Wkrs.*, 847 F.2d 680 (11th Cir. 1988).

any way on the employment. If public policy is offended–as it seems to have been–the performance of employment duties has nothing to do with it.

861 F.2d at 670-71.  The relevant inquiry, explained the court, is this: "Does an established public policy condemn the performance of employment activities in the manner engaged in by the employee?"

The Eleventh Circuit's approach in *Delta Air Lines* has been rejected by two circuits, and followed by two others. The Ninth Circuit, *en banc,* concluded that

> the Eleventh Circuit's opinion in Delta is, to a large extent, simply inconsistent with the law was expressed in Grace and Misco. The Eleventh Circuit did not rely on the FAA's determination, alluding to it only in passing in a footnote. 861 F.2d at 668 n.3. Instead, the Delta court reasoned that , since what the pilot had done in flying drunk was illegal, the "performance of his employment [was] the very thing which offends public policy" and thus reinstatement was impermissible. 861 F.2d at 674. As we have explained, the critical inquiry is not whether the underlying act for which the employee was disciplined violates public policy, but whether there is a public policy barring reinstatement of an individual who has committed a wrongful act. [Citing *Grace* and *Misco*].

*Stead Motors of Walnut Creek v. Automotive Machinists Lodge NO. 1173,* 886 F.2d 1200, 1215 (9th Cir. 1989). *Accord, Interstate Brands v. Chauffeurs, Teamsters, Local Union 135,* 909 F.2d 885 (6th Cir.1990).

Two circuits have held outright that the prevention of sexual harassment is sufficient to invoke the public policy exception to the general rule that courts should not set aside arbitration awards which draw their essence from the contract. In *Newsday v. Long Island Typographical Union, No. 415, CWA, AFL-CIO,* 915 F.2d 840 (2nd Cir.1990), a grievant had

12

been reinstated by an arbitration award after having been discharged for sexually harassing

female co-workers. The Second Circuit affirmed the district court vacatur of the arbitration

award after reviewing the federal statutes  and regulations, and case law, concluding that

"there is an explicit, well-defined, and dominant public policy against sexual harassment in

the work place[,]" and that the arbitration award "prevents Newsday from carrying out its

legal duty to eliminate sexual harassment in the work place." *Id.* at 845. The Third Circuit

dealt with the same issue in *Stroehmann Bakeries, Inc., v. Local 776, Int'l Bro. of Teamsters,*

969 F.2d 1436 (3rd Cir. 1992), holding that an arbitrator's award reinstating an employee

accused of sexual harassment without a determination on the merits of the allegation

"violates well-established and dominant public policies concerning sexual harassment in the

workplace." *Id.* at 1438. It reasoned

> [A]n award which fully reinstates an employee accused of sexual harassment without
> a determination that the harassment did not occur violates public policy. Therefore,
> [the arbitrator] construed the Agreement between the parties in a manner that conflicts
> with the well-defined and dominant public policy concerning sexual harassment in the
> workplace and its prevention. His award would allow a person who may have
> committed sexual harassment to continue in the workplace without a determination
> of whether sexual harassment occurred. Certainly, it does not discourage sexual
> harassment. Instead, it undermines the employer's ability to fulfil its obligation to
> prevent and sanction sexual harassment in the workplace.

*Id.* at 1442.[4]

---

[4] There was a vigorous dissent by Judge Becker, but he did not quarrel with the
proposition that "a public policy against sexual harassment in the workplace can readily be
derived from the federal statutes and regulations as well as from judicial decisions," and that "if
the public policy against sexual harassment were offended by this arbitrator's decision, the award
could not stand." *Id.* at 1450.

The Fourth and Tenth Circuits have held that the general public policy against sexual harassment is not sufficient to supplant labor arbitration of employee disciplinary sanctions. *Communications Workers of Am. v. Southeastern Elec. Coop.,* 882 F.2d 467 (10th Cir.1989); *Westvaco Corp. v. United Paperworkers Int'l Union,* 171 F.3d 971 (4th Cir. 1999).

In *Chrysler Motors Corp. v. International Union,* 959 F.2d 685 (7th Cir. 1992), the Seventh Circuit noted the "well-recognized" public policy against sexual harassment in the workplace arising from federal statutes and case law. *Id.* at 687-688.  But it declined to invoke the public policy exception to set aside the arbitrator's reinstatement award, deferring instead to the arbitrator's judgment that a 30-day suspension rather than discharge would be "adequate to deter [the grievant] from further misconduct and to demonstrate to all employees Chrysler's opposition to sexual harassment." *Id.* at 686.[5]  Notably, the arbitrator possessed  the contractual authority to determine what constitutes 'good cause" for discharge.

Whatever the law in other circuits, this court is bound by the law of the Eleventh Circuit. And in this circuit, the public policy exception to the judicial enforcement of arbitration awards has two elements: 1) law and legal precedents establishing a well-defined and dominant public policy, and 2) violation of the public policy by an employee while

---

[5] The *Chrysler* court noted *Delta Airlines* but distinguished it on the basis that the grievant was not performing the integral duties of his position as a forklift operator when he sexually assaulted his female co-worker. *Id.*,n.3 at p.689.

performing his duties as an employee. Unless these elements are satisfied, the arbitral award must be enforced.

### III. Analysis

Racial harassment in the workplace violates 42 U.S.C. § 2000e (Title VII)'s ban prohibiting racial discrimination "against any individual with respect to his compensation, terms, conditions, or privileges of employment." 42 U.S.C. § 2000e-2(a)(1). The Equal Employment Opportunity Commission ("EEOC") has long recognized that harassment on the basis of race is an unlawful employment practice under Title VII. *See* 2 EEOC Compl. Man. § 615.7 (CCH). Harassment which is sufficiently severe or pervasive to alter the terms and conditions of an employee's employment and create an abusive working environment is generally condemned by Title VII. *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 65-66, 106 S.Ct. 2399, 2404-2405 (1986). Our circuit has repeatedly held that an employer violates Title VII "simply by creating or condoning an environment at the workplace which significantly and adversely affects (the psychological well-being of) an employee because of his race or ethnicity...." *Walker v. Ford Motor Co.,* 684 F.2d 1355, 1358 (11th Cir.1982), (citing *Henson v. City of Dundee*, 682 F.2d 897, 901 (11th Cir. 1982). *See also, Rogers v. EEOC*, 454 F.2d 234, 238 (5th Cir. 1981).

Moreover, 42 U.S.C. § 1981, whose roots have grown and developed over the last one and a third century, and particularly in the lat nine years, establishes a dominant national policy forbidding racial discrimination and harassment in the workplace. In *Patterson v.*

15

*McLean Credit Union,* 491 U.S. 164, 109 S. Ct. 2363 (1989), a bitterly divided Supreme Court held that this venerable statute 42 U.S.C. did not cover racial harassment in the workplace. Two years later, the Congress overturned this niggard interpretation of § 1981 by enactment of The Civil Rights Restoration Act of 1991, which makes it clear that the statute covers "the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981 (b). Certainly, freedom from a racially hostile work environment is a "benefit, term, and condition" of the employment relationship.

And the national policy is binding on unions as well as employees. *See Goodman v. Lukens Steel Co.,* 482 U.S. 656 (1987); (union violated both Section 1981 and Title VII where it chooses not to process racial grievance under the equal employment clause of the union contract with the aim of enhancing its probabilities of success on other issues); *Terrell v. U.S. Pipe & Foundry Co.,* 644 F.2d 1112, 1120 (5th Cir. Unit B 1981), vacated on other grounds, 456 U.S. 955 (1982); *Howard v. Int"l Moulders & Allied Wrkrs. Union, Local 100,* 779 F.2d 1546 (11th Cir. 1986); (unions have an affirmative duty to eliminate any form of racial discrimination).

Equally clear is that Bobby Campbell violated this public policy while performing his duties as an employee of TAMKO. It was in specific reference to Campbell and Williams' performance of their respective duties that Campbell made the racially offensive statement.

Based on these considerations, the arbitrator's award should not be enforced by this court.

By separate order, TAMKO's motion for Summary Judgment will be granted. The
Union motion will be denied.


DONE this ____31st____ day of August, 2000.

_____
UNITED STATES DISTRICT JUDGE
U. W. CLEMON